NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                            :
HALLIE W. THE LOSEN,                        :
                                            :          **Civil Action No. 07-6140 (JAP)**
                 Plaintiff,                 :
                                            :
v.                                          :
                                            :          **OPINION**
MICHAEL J. ASTRUE,                          :
Commissioner of Social Security,            :
                                            :
                 Defendant.                 :
_____:

PISANO, District Judge:

Before the Court is the appeal of Hallie W. The Losen ("The Losen" or "Plaintiff") from the final decision of the Commissioner of the Social Security Administration ("SSA") denying her request for Childhood Disability Benefits ("CDB") and Disability Insurance Benefits ("DIB"). The Court has jurisdiction to review this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) and reaches its decision without oral argument. *See* Fed. R. Civ. P. 78. For the reasons set forth herein, the Court finds that the record provides substantial evidence to support the Administrative Law Judge's ("ALJ") judgment and therefore affirms the final decision of the Commissioner.

## I.     PROCEDURAL HISTORY

The Losen filed applications for CDB, DIB, and Supplemental Security Income ("SSI") payments on June 25, 2002, alleging she has suffered disabilities since 1977 related to eye

disease, allergies, a learning disability, and anxiety-related disorders.  The SSA approved The

Losen's application for SSI payments based on the earliest date of eligibility—June 25,

2002—but denied her claims for CDB and DIB, both initially and upon reconsideration.[1]  Upon

The Losen's request, a hearing was held before ALJ Barrett on June 23, 2005 (the "ALJ

hearing").  After reviewing the evidence and considering the testimony of The Losen and her

mother, the ALJ concluded that The Losen did not have a "severe" impairment on or before the

pertinent eligibility dates and denied her claims for both CDB and DIB.[2]  On October 25, 2007,

The Losen's request for review was denied by the Appeals Counsel and the ALJ's decision was

thereby rendered the final decision of the Commissioner.

## II.    BACKGROUND

### A.    Educational Background and Work History

The Losen was born on October 13, 1973.  (R. at 113.)  After graduating from Manasquan

High School in 1993, she spent three years at Ocean County College before enrolling at

Monmouth University.  (R. at 112, 124.)  In 2001, after five years of study, The Losen received

her diploma from Monmouth.  (R. at 124, 382.)  Later that year, she also completed classes and

became certified in computer training.  (R. at 124, 349-50.)

During high school in 1990, The Losen worked two part-time jobs, as a vendor at Ritz

Bakery and Deli and as a server at Spring Lake Arbors.  (R. at 145.)  During her summer and

winter breaks from Ocean County in 1995, she was employed at two different retail stores,

---

[1]      The Losen was granted SSI benefits based on a primary diagnosis of anxiety-related disorders and a
secondary diagnosis of learning disorders.  (R. at 11, 22.)

[2]      In order to be eligible for CDB, The Losen is required to demonstrate that she was under a disability prior
to her twenty-second birthday (October 13, 1995).  For DIB, the relevant date of disability is on or before March 31,
2001, the date The Losen's insured status expired.

spending the majority of her time stocking inventory.  (R. at 133, 146.)  In the summer of 1998,

during a break from Monmouth University, The Losen participated in a workforce program for

the disabled sponsored by the United States Department of State.  (R. at 134, 150.)  While there,

she worked at the front desk answering questions, using a computer, and delivering documents to

other employees and offices.  (R. at 134.)  During the winter of 1999-2000, The Losen was

employed at the Center for Orthopedics and Sports where she performed primarily secretarial

functions—calling patients, using the fax machine, and data input.  (R. at 135.)  At the time of

the ALJ hearing, The Losen was unemployed and living at home with her mother.  (R. at 350-

51.)

    **B.**    **Medical History**

        1.    *Eye Disease (Thygeson's superficial punctuate keratitis)*

The Losen first visited Dr. Maria Megill of Eyes First Vision Center on July 31, 1993,

and complained of pain, redness, tearing, and continued photosensitivity in both eyes.  (R. at

223.)  Upon examination, Dr. Megill noted numerous lesions in The Losen's eyes and diagnosed

her with Thygeson's superficial punctuate keratitis ("Thygeson's SPK").[3]  For treatment, Dr.

Megill prescribed antibiotics, eye drops, and mild steroids.  (R. at 215.)  Over the course of the

following two months, Dr. Megill noted immediate improvement in The Losen's condition and

described the lesions in her eyes as "healing," and eventually observed that the lesions had

"cleared up."  (R. at 215.)

---

[3]    Thygeson's SPK is an eye disease primarily affecting the cornea and is generally characterized by the
presence of small epitheal lesions.  Dorland's Illustrated Medical Dictionary, 972-73 (30th ed. 2003).

-3-

Dr. Megill then referred The Losen to Dr. Mark A. Friedberg of Mid-Atlantic Eye Center for further evaluation.  (R. at 213.)  On June 30, 1994, Dr. Friedberg reaffirmed Dr. Megill's diagnosis of Thygeson's SPK and had The Losen continue her treatment with "the lowest steroid dose possible."  (R. at 213.)  Upon re-evaluation on May 4, 1995, The Losen informed Dr. Friedberg that the disease had been under "excellent control" until two months prior, when symptoms of redness and photophobia reemerged.  (R. at 211.)

The Losen continued to visit Dr. Megill and Dr. Friedberg through November 2, 2001. Throughout that period, Dr. Megill characterized The Losen's condition as "chronic" with frequent "exacerbations and remissions."  (R. at 195.)   In periods of exacerbation, both doctors prescribed The Losen mild doses of steroids to quell her complaints of foreign body sensation, photosensitivity, and pain.  (R. at 191, 206.)   At the time of her final appointment with Dr. Megill on November 2, 2001, The Losen's condition had dissipated and she was no longer using steroid eye drops.  (R. at 191.)

On December 28, 2001, pursuant to The Losen's request, Dr. Megill wrote a note to her insurer.  (R. at 191.)  In the note, Dr. Megill verified The Losen's condition and explained the effect it had on her ability to work.  (R. at 192.)  Specifically, Dr. Megill opined that pain and photophobia *could* lead to problems with "travel . . . and . . . ambulation" as well as "sustained concentration" and "persistence."  (R. at 192.)  She further noted that The Losen was capable of independently initiating activities, and gross and fine movements.   (R. at 192.)

At the ALJ hearing, The Losen indicated that her eye disease continues to trouble her and flares up about once a year.  (R. at 353.)  Notwithstanding her allegations regarding her eye

condition, The Losen's vision remained 20/20 or better throughout all of Dr. Megill's and Dr.

Friedberg's treatment.  (R. at 167, 202-03, 223.)

       2.    *Allergies*

The Losen further asserts a history of perennial and seasonal allergies dating back to

when she was approximately sixteen or seventeen years old.  (R. at 341.)  In the work history

report submitted to the Social Security Administration, The Losen stated that her allergy troubles

caused her to prematurely terminate her employment at both the bakery in 1993 and the retail

store in the winter of 1995.  (R. at 131-33.)  A CT Scan administered on December 12, 1995 by

Dr. Daniel Wujack suggested the existence of chronic sinusitis "of a mild nature."  (R. at 277.)

Complaining of recurring sinus problems and difficulty breathing, The Losen visited Dr.

Suresh Giri on May 5, 2001.  (R. at 176.)  Dr. Giri diagnosed The Losen with severe allergic

rhinitis and prescribed Guiafed and Bromfed.  (R. at 176-77.)  However, based upon the results

of a CT Scan administered a month later in June 2001, Dr. Giri concluded that there was no

evidence of acute or chronic sinusitis.  (R. at 173.)

At an initial consultation with Dr. Robert Rabinowitz on September 5, 2001, The Losen

described persistent symptoms of postnasal drip, headaches, and significant sensitivity to a

variety of aeroallergens including mold, dust, grass, and perfumes. (R. at 237-38.)  Following a

series of tests, Dr. Rabinowitz diagnosed The Losen with allergic rhinitis and sinusitis. ( R. at

238.)  He continued The Losen on Claritin D, Astelin, and Zithromax and suggested that she

consider allergy injections given the persistence of her symptoms.  (R. at 238, 232.)   At a follow-

up visit on July 12, 2002, The Losen reported an incident during which she lost consciousness

and developed hives after encountering strong smells.  (R. at 229.)  Dr. Rabinowitz posited that

it may have been an anaphylactic episode and advised The Losen to carry Benadryl and an Epi-Pen with her on a regular basis.  (R. at 230.)  The Losen continues to see Dr. Rabinowitz regularly.  (R. at 360.)

        3.     *Learning Disability*

The Losen alleges that she suffered from a learning disability as early as 1977.  (R. at 377.)  Throughout first through seventh grade, The Losen received remedial help in reading, mathematics, and writing.  (R. at 158.)  In fifth grade, she was diagnosed with dyslexia.  (R. at 158.)  The Losen contends that she was enrolled in special education classes or otherwise individually accommodated throughout high school, though her high school transcript omits any reference to such enrollment.  (R. at 367, 112.)

On August 31, 1993, Jorene Burke, a learning disability specialist from Ocean County College, completed an assessment report based upon the results of two testing sessions with The Losen.  (R. at 158-65.)[4]  Burke concluded that The Losen exhibited a specific learning disability in the area of processing speed that directly impacted her note-taking, test-taking, problem-solving, abstract thinking, and language processing abilities.  (R. at 163.)  In the achievement area, her greatest weakness was in basic reading.  (R. at 163.)  The Losen did, however, exhibit cognitive ability in long-term retrieval and visual processing, demonstrating definite strengths in broad mathematics, passage comprehension, and holistic written expression.  (R. at 163.)  Burke attributed her "better than . . . expected" performance in these areas to her "persistence and motivation, as well as her ability to advocate for the academic adjustments she needs."  (R. at

---

[4]      Burke administered selected tests from the Woodcock-Johnson Psychoeducational Battery-Revised, a wide-range, comprehensive set of tests for measuring cognitive abilities, scholastic aptitudes, and achievement.  (R. at 158.)

163.)  Based upon these assessment results, Burke recommended that Ocean County College accommodate The Losen by providing her with multisensory learning, an alternative test site with a proctor, extended time for assignments and tests, and preferential front of class seating. (R. at 164.)  Burke further concluded that The Losen's learning disability did not appear to be the result of "subnormal intelligence, sensory impairments, emotional problems, or educational or environmental deprivation."  (R. at 164.)

On September 7, 1999, Dr. Martin Berlin of Psychological Laboratories, Inc. evaluated The Losen and administered a variety of cognitive tests.  (R. 168-71.)[5]  During his interview with The Losen, Dr. Berlin noted that her short-term attention span was within the average range and that she was alert to detail.  (R. at 169.)  Test results further demonstrated good word knowledge and verbal fluency.  (R. at 169.)  The Losen's Wechsler Adult Intelligence test scores revealed a verbal intelligent quotient ("IQ") of 104, a performance IQ of 106, and a full scale IQ of 105, all of which fall within the average range.  (R. at 168.)[6]

Psychological testing administered by Dr. Eleanor Siegel on January 23, 2003 yielded dramatically divergent results than those obtained by Dr. Berlin years earlier.  (R. at 284-87.) This time, The Losen achieved a verbal IQ of 79, a performance IQ of 69 and a full scale IQ of 72, placing her in the borderline range of intellectual functioning at the third percentile.  (R. at 286.)  Her arithmetic score was in the mentally retarded range of functioning and her attention span and perceptual organization were "quite poor."  (R. at 286.)  Based upon these results, Dr.

---

[5]       Dr. Berlin administered the Mental Status Exam, the Wechsler Adult Intelligence Scale, the Bender Motor Gestalt Test, the Cornell Psychiatric Index, and a Vocational Interest Inventory.  (R. at 168.)

[6]       During her testimony at the ALJ hearing, The Losen's mother asserted, without corroboration, that these results were not valid and that her IQ scores had been "spun in an upward direction" so that she could enter a vocational program.  (R. at 383.)

Siegel concluded that The Losen suffered from a probable developmental disorder with likely learning disabilities at least in mathematics.  (R. at 287.)

In a report to the New Jersey Division of Disability Services dated December 3, 2001, Dr. Michael DiBella of Alpha Medical Services listed a learning disorder as The Losen's primary diagnosis, and a motor vehicle accident and seasonal pollutants as minor diagnoses.  (R. at 179.) Based upon these ailments, Dr. DiBella cited a disability onset date of June 2001 and opined that The Losen was not suited to participate in a volunteer or community service work program, nor was she able to enter into a school or vocational training program.  (R. at 179.)  He further classified her functional capacity as Class III, or "adequate to perform only little or none of the duties of usual occupation or of self-care."  (R. at 179.)

4.    *Anxiety-Related Disorders*

At her appointment with Dr. Michael DiBella in 2001, The Losen also complained of difficulty sleeping and anxiety attacks.  (R. at 178.)  After evaluating The Losen, Dr. DiBella made no diagnosis but nevertheless prescribed Paxil, a psychotropic medication designed to treat anxiety and depression.  (R. at 178.)  When The Losen requested a refill of her Paxil prescription about one year later on September 11, 2002, the treating physician at Community Medical Center requested that she first undergo psychological evaluation.  (R. at 250.)  The Losen and her mother reportedly took offense to this request and refused examination.  (R. at 250.)  However, treatment records from Community Medical Center reveal that The Losen was ultimately diagnosed with anxiety on October 21, 2002.  (R. at 244-46.)

At her mental status evaluation with Dr. Siegel on January 23, 2003, The Losen reported a series of recent panic attacks, the last occurring just one day prior to her evaluation.  (R. at 285-

-8-

86.)  She also reported trouble sleeping, obsessive-compulsive symptoms, and a general loss of interest in things around her.  (R. at 285.)  Based upon these symptoms, Dr. Siegel diagnosed The Losen with panic disorder with agoraphobia,[7] obsessive-compulsive order, and somatoform disorder.[8]  (R. at 287.)

On February 6, 2003, a state agency psychological consultant, Dr. Ira Gash, completed a mental residual functional capacity assessment and psychiatric review based on Dr. Siegel's findings.  (R. at 288-304.)  Dr. Gash found The Losen markedly limited in her ability to: (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (2) work in coordination with or proximity to others without being distracted by them; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (R. at 288-302.)  Dr. Gash also found The Losen moderately limited in ten other areas.  (R. at 288-89.)  On April 29 and August 5, 2003, two more state agency psychological consultants analyzed the severity of The Losen's medical condition between July 1999 and March 31, 2001.  (R. at 305-17.)  After reviewing the relevant medical records, they found insufficient evidence to determine whether The Losen had a severe mental impairment on or before that period.  (R. at 305-17.)

---

[7]      Agoraphobia is the fear of being in places or situations in which a panic attack may occur, or from which escape would be difficult or highly embarrassing.  Panic Disorder, http://www.webmd.com/anxiety-panic/guide/mental-health-panic-disorder (last visited July 15, 2009).

[8]      A person with somatoform disorder experiences physical symptoms of an illness even though the doctor can find no medical causes for the symptoms.  Mental Health: Types of Mental Illness, http://www.webmd.com/mental-health/mental-health-types-illness (last visited July 15, 2009).

A final consultative psychological examination was completed by Dr. Alexander Iofin on September 19, 2004.  (R. at 337-40.)  In his report, Dr. Iofin supplied diagnoses of a learning disability, general anxiety disorder, agoraphobia, panic disorder, and borderline intellectual functioning.  (R. at 339.)  Dr. Iofin did not, however, indicate an onset date for these conditions on or before March 31, 2001.  He further recommended that The Losen become involved with a mental health clinic near her mother's home.  (R. at 339.)

## III.   STANDARD OF REVIEW

### A.   Substantial Evidence Review

A reviewing court must uphold the final decision of the Commissioner if it is supported by "substantial" evidence.  42 U.S.C. § 405(g); § 1383(c)(3); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).  For evidence to be deemed "substantial," it must be more than a "mere scintilla," *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938), but may be slightly less than a preponderance.  *Stunkard v. Sec'y of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).  The inquiry is not whether the reviewing court would have made the same determination, but rather whether the Commissioner's conclusion was reasonable given the record before him. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

While a reviewing court is to give deference to administrative decisions, *see Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999), its "substantial evidence" review cannot be conducted without some indication that the ALJ has evaluated all the relevant evidence. *Cotter v. Harris*, 642 F.2d 700, 705-06 (3d Cir. 1981).  Therefore, an administrative decision should provide a "clear and satisfactory explanation of the basis on which it rests." *Id.* at 704. When the record shows conflicting evidence, the ALJ "must adequately explain in the record his

reasons for rejecting or discrediting competent evidence." *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (*citing Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)).  Indeed, access to the Commissioner's reasoning is essential to meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'

*Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (*quoting Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977)).

The reviewing court has a corresponding obligation to review the evidence in its totality. *See Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).  In order to do so, "a court must 'take into account whatever in the record fairly detracts from its weight.'"  *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (*quoting Willibanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1988) (internal citation omitted)).  Nevertheless, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams*, 970 F.2d at 1182 (*citing Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir. 1984)).

## B.    Disability Defined

To be eligible for CDB, DIB, and/or SSI benefits, a claimant must demonstrate that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A), § 402(d), §1382c(a)(3)(A).  Furthermore, he must show that the impairment or impairments are "of such a severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A), 1382c(a)(3)(B).

### C.    The Five-Step Analysis for Determining Disability

Social Security regulations provide a five-step, sequential evaluation procedure to

determine whether a claimant is disabled.  *See* 20 C.F.R. §§ 404.1520.  For the first two steps,

the claimant must establish that he: (1) has not engaged in "substantial gainful activity" since the

onset of his alleged disability; and (2) suffers from a "severe impairment" or "combination of

impairments."  20 C.F.R. §§ 404.1520(b)-(c).  Given that the claimant bears the burden of

establishing these first two requirements, his failure to meet either standard automatically results

in a denial of benefits.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

If the claimant satisfies his initial burdens, the third step requires that he provide evidence

that his impairment is equal to or exceeds one of the impairments listed in Appendix 1 of the

regulations ("Listing of Impairments").  20 C.F.R. § 1520(d).  Upon such a showing, the claimant

is presumed disabled and is automatically entitled to disability benefits.  20 C.F.R. §

404.1520(d).  If he cannot so demonstrate, the benefit eligibility analysis proceeds to steps four

and five.

The fourth step of the analysis focuses on whether the claimant's "residual functional

capacity" is sufficient to permit him to resume his previous employment.  20 C.F.R. §

404.1520(e)-(f).  Again, the burden remains with the claimant.  *Fargnoli v. Halter*, 247 F.3d 34,

39 (3d Cir. 2001).   If the claimant is found to be capable of returning to his previous line of

work, then he is not "disabled" and therefore ineligible to receive disability benefits.  20 C.F.R. §

404.1520(f).  Should the claimant be unable to return to his previous work, the analysis proceeds to step five.

At step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other substantial gainful work.  20 C.F.R. § 404.1520(g).  If the Commissioner cannot satisfy this burden, the claimant is deemed "disabled" and is entitled to benefits.  *See Yuckert*, 482 U.S. at 146-47 n.5.

## IV.   THE ALJ'S DECISION

After reviewing all of the evidence in the record, the ALJ denied The Losen's claims for both CDB and DIB, concluding that she was not disabled on or before the pertinent eligibility dates.  At step one of the sequential evaluation, the ALJ found that The Losen had not engaged in substantial gainful activity at any point since October 1, 1977, the alleged onset date of her disability.

Proceeding to step two of the analysis, the ALJ determined that The Losen's alleged impairments were not severe prior to her twenty-second birthday, October 13, 1995, as required to receive CDB.  Concerning her alleged learning disorder, the ALJ noted the absence of any objective evidence documenting The Losen's claimed enrollment in special education classes in high school.  He also relied on Dr. Burke's assessment report and the IQ test results obtained by Dr. Berlin as persuasive evidence that The Losen's learning disorder was not a severe impairment prior to her twenty-second birthday.  With regard to The Losen's alleged eye impairment, the ALJ considered the treatment records of Dr. Friedberg and Dr. Megill and concluded that there was no evidence that the cited functional limitations caused by Thygeson's SPK were "severe" within the meaning of the Social Security Regulations.

-13-

The ALJ next examined whether The Losen was disabled on or before March 31, 2001, the date on which her insured status expired for DIB.  After considering the records of Dr. Giri and Dr. Rabinowitz, the ALJ rejected the contention that The Losen's allergy troubles resulted in anything more than "minimal functional limitations," thus failing step two of the sequential analysis.  (R. at 15.)  The ALJ also considered the mental health records and reports from Community Medical Center, Dr. Siegel, the various state agency consultants, and Dr. Iofin, and noted that these records reference treatment and diagnoses of anxiety-related disorders only *after* March 31, 2001, the pertinent date at issue.  He also stressed the fact that two state agency psychological consultants specifically analyzed the severity of the claimant's mental disorder for the period from July 1999 to March 31, 2001 and concluded that there was insufficient evidence to determine if The Losen had a severe mental impairment during that period.

Finally, the ALJ addressed Dr. BiBella's 2001 report in which he listed The Losen's disability onset date as June 2001 and opined that her functional capacity was adequate to perform little or none of the duties of usual occupation or self-care.  Recognizing that a case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion, the ALJ determined that the treatment records and objective evidence failed to provide any rationale for Dr. DiBella's determination of the date of onset.  Accordingly, he rejected Dr. DiBella's assessment.  Having reviewed the record in its entirety, the ALJ found that The Losen failed to show that she had any severe impairment or combination of impairments on or before March 31, 2001.  Therefore, she failed to meet her burden at step two and the ALJ's evaluation ended there.

## V.      LEGAL DISCUSSION

The Losen challenges the ALJ's decision on three grounds: (1) the ALJ improperly and prematurely concluded that The Losen's combined impairments were not "severe" at step two of the evaluation; (2) the ALJ failed to adequately develop the record by consulting a medical advisor and obtaining further medical records; and (3) the ALJ erroneously required objective medical evidence to establish an earlier onset date.

### A.      The ALJ's Dismissal of The Losen's CDB and DIB Claims at Step Two

The Losen argues that the ALJ erred by determining that she did not have a "severe" impairment prior to October 15, 1995 or March 31, 2001.  Specifically, she asserts that the inquiry at step two of the sequential evaluation is a "de minimus screening device" that "only allows claims based on the most trivial impairments to be rejected."  (Pl.'s Br. 19.)  Accordingly, she maintains that her medical ailments were sufficiently severe so as to satisfy this "rarely utilized" basis for the denial of benefits.  (Pl.'s Br. 20.)

First, the Court notes that the claimant bears the burden of establishing that she suffers from a "severe impairment" or "combination of impairments."  20 C.F.R. §§ 416.920(b)-(c).   An impairment is not "severe" if it does not significantly limit a claimant's physical or mental capacity to perform basic work activities.  20 C.F.R. § 404.1521(a).  These activities include physical functions such as walking, lifting, carrying, seeing, hearing and speaking.  20 C.F.R. § 404.1521(b)(1)-(2).  Also considered in determining whether an impairment is severe are mental functions such as understanding, carrying out, and remembering simple instructions, using judgment, responding appropriately to supervision and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b)(3)-(6).

-15-

The burden placed on an applicant at step two is not an exacting one.  *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  Indeed, as The Losen noted, the step-two inquiry is a "de minimis screening device to dispose of groundless claims," and reasonable doubts on severity are to be resolved in favor of the claimant.  *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003).  However, a reviewing court may not apply a more stringent standard of review and the Commissioner's denial at step two must be upheld if supported by substantial evidence on the record.  *McCrea*, 370 F.3d at 360-61.

The Court notes that it need only consider The Losen's physical and mental capacity prior to her twenty-second birthday, October 13, 1995, when reviewing the ALJ's denial of CDB.  However, because this time period is necessarily examined when assessing The Losen's claim for DIB, this Court considers both claims.  Upon review of the record, there is substantial evidence to support the ALJ's decision denying The Losen CDB and DIB.

Concerning The Losen's alleged eye impairment, medical records from Dr. Megill and Dr. Friedberg confirm that The Losen was treated for Thygeson's SPK from 1993 through 2001.  Her treatment throughout this period was intermittent, however, and The Losen admitted at the ALJ hearing that the disease only flares up about once a year.  (R. at 353.)  Even when the disease was in its active stage, The Losen was generally kept on the "lowest steroid dose possible."  (R. at 213.)   Furthermore, The Losen's vision was unaffected by her condition and remained 20/20 or better throughout the entire period during which she was treated.  (R. at 167, 202-03, 213, 223.)  Additionally, the ALJ properly considered Dr. Megill's December 28, 2001 note in which she cited some functional limitations that "could" arise from The Losen's eye condition.  (R. at 192.)  As indicated by the ALJ, Dr. Megill's note was in reference to only those

limitations that "could" hypothetically arise, not limitations that The Losen actually experienced. (R. at 15.) Indeed, the record is devoid of any evidence indicating that The Losen's eye condition ever seriously impeded her functioning or daily activities. Accordingly, there is substantial evidence to support the ALJ's determination that The Losen's eye condition does not constitute a "severe" impairment as defined under the Social Security Act.

There is also substantial evidence to support the ALJ's determinations regarding The Losen's alleged allergies. While The Losen contended that allergy troubles caused her to terminate her employment in both 1993 and 1995, Dr. Wujack's examination in 1995 suggested the existence of sinusitis of only a "mild nature." (R. at 277.) It was not until September 5, 2001 that Dr. Rabinowitz diagnosed The Losen with sinusitis and allergic rhinitis. (R. at 238, 232.) Indeed, when questioned by the ALJ about whether her allergies were worse in 1995 or 2001, The Losen indicated that her sinuses had "gotten worse" since she'd gotten older. (R. at 355.) Furthermore, The Losen's treatment was limited to common allergy medications throughout this entire period (R. at 176-77, 227-40) and, as noted by the ALJ, her allergies caused no more than "minimal functional limitations." (R. at 15). Thus, while understandably aggravating, The Losen's allergies did not significantly limit her physical or mental capacity to perform basic work activities as defined in 20 C.F.R. § 404.1521(a). Accordingly, the ALJ did not err in concluding that her allergies were not a "severe" impairment on or before October 13, 1995 or March 31, 2001.

Furthermore, there is substantial evidence to support the ALJ's conclusions regarding The Losen's alleged learning disability. Despite The Losen's allegations that she was enrolled in special education classes throughout high school, the ALJ correctly noted that her high school

transcript omits any reference to such enrollment.  (R. at 13, 112.)  Instead, it shows that she

graduated within the normal four year period and received passing grades in the vast majority of

her classes (R. at 112.)  Moreover, although Burke cited The Losen with a *specific* learning

disability in her 1993 assessment report, she also indicated that The Losen exhibited cognitive

strengths in long-term retrieval, visual processing, broad mathematics, passage comprehension,

and holistic written expression.  (R. at 163.)  Indeed, Burke attributed her "better than . . .

expected" performance in these areas to her "persistence and motivation, as well as her ability to

advocate for the academic adjustments she needs."  (R. at 163.)  As the ALJ noted, Burke

concluded that The Losen's learning disability did not appear to be the result of "subnormal

intelligence, sensory impairments, emotional problems, or educational or environmental

deprivation."  (R. at 163.)  Additionally, The Losen's extensive education after high school,

including her schooling at Ocean County, Monmouth, and computer training school, is strong

evidence that her learning disorder was not a "severe" impairment prior to March 31, 2001.

The results obtained through Dr. Berlin's testing in 1999 provide particularly compelling

evidence in support of the ALJ's determination.  As the ALJ proffered, The Losen's IQ

scores—which fell within the average range—are "clearly indicative" of a finding that The

Losen's alleged learning disability was not severe prior to March 31, 2001.  (R. at 14.)  Despite

her mother's allegation that The Losen's IQ scores had been "spun in an upward direction" so

that she could enter a vocational program, there is no basis upon which to discredit Dr. Berlin's

results.  (R. at 383.)  Indeed, The Losen's mother also alleged that Dr. Berlin had spent only five

minutes with her daughter even though he administered several cognitive tests and recorded

extensive observations of The Losen during her interview. (R. at 168-71.)  Furthermore, although

-18-

The Losen's IQ scores dropped markedly in the testing conducted by Dr. Siegel in 2003, these results were obtained well after the dates under consideration.  (R. at 286.)  The ALJ made note of this discrepancy and pointedly cited Dr. Siegel's failure to comment on The Losen's prior IQ scores.  (R. at 16.)

Dr. DiBella's 2001 assessment reporting The Losen's primary diagnosis as a learning disorder is the only medical evidence in the record suggesting a disability onset date prior to that of the SSI determination.  As stated above, when the record shows conflicting evidence, the ALJ "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Ogden*, 677 F. Supp. at 278 (*citing Brewster* 786 F.2d 581)).  An opinion that states that a claimant is "disabled" or "unable to work"—such as Dr. DiBella's—is not a medical opinion but is instead an opinion reserved to the Commissioner because it involves findings that are dispositive of a case.  20 C.F.R. § 404.1527(e). Consequently, such opinions are not entitled to controlling weight but must be carefully considered to determine the extent to which they are supported by the record or contradicted by persuasive evidence.  20 C.F.R. § 404.1527(d).

Here, the ALJ spent five entire paragraphs summarizing Dr. DiBella's report and explaining his rationale for rejecting it.  (R. at 17-18.)  First, he noted the total lack of objective evidence to support Dr. DiBella's opinion.  (R. at 18.)  He found his report to be inconsistent with The Losen's performance in high school and college and cited Dr. DiBella's failure to relate his opinion to any specific findings.  (R. at 18.)  For those reasons, he expressly rejected the doctor's assessment that The Losen was disabled as of June 2001.  (R. at 18.)  Based upon the entirely of the evidence, the ALJ's determination that The Losen's learning disability was not a "severe" impairment prior to March 31, 2001 is supported by substantial evidence.  Accordingly,

-19-

this Court holds that the ALJ's treatment of Dr. DiBella's report was consistent with *Ogden* and 20 C.F.R. § 404.1527(d).

Finally, there is substantial evidence to support the ALJ's determination regarding The Losen's alleged anxiety-related disorders.  In reaching his decision, the ALJ considered all of the records from the various medical sources who treated The Losen from 2001 through 2004. Importantly, he noted that the diagnoses of anxiety in 2002 and panic disorder, obsessive-compulsive disorder, and somatoform disorder in 2003, came well after March 31, 2001, the pertinent date of eligibility.  (R. at 15.)  Nevertheless, The Losen still contended that, because the "medical findings were severe and disabling" as of June 2002, it is a "reasonable inference" that they existing "long before that time."  (Pl.'s Br. 16.)  This argument is without merit.  As stated above, the record indicates that The Losen did not report any symptoms of anxiety until 2001. (R. at 178.)  Moreover, two state agency medical consultants specifically examined The Losen's medical records from July 1999 to March 31, 2001 and determined that there was insufficient evidence to assess her mental functional capacity during that period (R. at 305).  Accordingly, the ALJ's determination that The Losen's alleged anxiety-related disorders did not constitute a "severe" impairment on or before March 31, 2001 is supported by substantial evidence.

Based upon the foregoing, the Court holds that the ALJ's decision that The Losen's alleged impairments, taken alone or in combination, were not "severe" prior to October 1, 1995 or March 31, 2001, is supported by substantial evidence.

## B.      The ALJ's Development of the Record

### 1.      *The ALJ's Failure to Consult a Medical Advisor to Infer an Earlier Onset Date*

The Losen further argues that the ALJ did not adequately develop the record. Specifically, she alleges that the ALJ was obligated to consult a medical advisor to assist him in inferring an earlier onset date and failed to do so.  The Losen bases her challenge on Social Security Ruling 83-20 ("SSR 83-20") and the Third Circuit's decisions in *Walton v. Halter*, 243 F.3d 703 (3d Cir 2000), *Beasich v. Commissioner*, No. 02-3627, 2003 WL 21299604 (3d Cir. June 3, 2003) and *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003).  Upon review, the Court finds this argument to be without merit.

The onset date of disability is the first day an individual is disabled as defined in the Social Security Act and regulations.  SSR 83-20.  Factors relevant to the determination of this date include the individual's allegation, work history, and medical evidence.  *Id.*  Medical evidence serves as the primary consideration in the onset determination and the individual's allegation or the date of work stoppage is significant only if consistent with the severity of the condition(s) shown by medical evidence*.  Id.*

SSR 83-20 dictates that an ALJ "should call on the services of a medical advisor" when he must infer the onset date of an impairment that is not clear from the claimant's medical records. *See Jakubowski v. Comm'r of Social Security*, No. 06-1377, 2007 WL 62894, *3 (3d Cir. Jan. 10, 2007).  This requirement is particularly critical where the impairment at issue is slowly progressing and the alleged onset date is so far in the past that obtaining adequate medical records is impossible.  *See* SSR 83-20; *Jakubowski*, 2007 WL 62894 at*3.

The instant case is clearly distinguishable from the Third Circuit decisions relied upon by The Losen.  In *Walton*, the claimant sought to establish that he was eligible for CDB because the onset date of his mental impairment, bipolar disorder-manic depression, preceded his twenty-second birthday.  *Walton*, 243 F.3d at 705.  The claimant lacked medical records to establish his claim but, as the Court observed, almost all of the medical evidence suggested an onset date prior to his twenty-second birthday.  *Id.* at 709.  For example, the claimant described a long history of suicide attempts, treatment by psychiatrists, and manic experiences pre-dating his twenty-second birthday and the ALJ recognized the slowly progressive nature and "reluctance of diagnoses" for illnesses such as bipolar disorder.  *Id.* at 705-06.  Accordingly, the Third Circuit reversed the District Court's order denying the claimant benefits and held that SSR 83-20 required the ALJ to call upon the services of a medical advisor to help infer an earlier onset date "rather than rely on his own lay analysis of the evidence."  *Id*.  The Court further held that ALJ erred by expressly ignoring, without reason, the opinions of two medical advisors suggesting an earlier onset date. *Id.* at 710.  Similarly, in *Beasich* and *Newell*, the Third Circuit reversed and remanded the ALJs' decisions for failing to follow SSR 83-20.  *See Beasich*, 2003 WL 21299604 at *11-12 (finding that the ALJ should have consulted a medical advisor to help infer an earlier onset date where the claimant alleged impairments resulting from a childhood head injury and seizure disorder); *Newell*, 347 F.3d at 548-49 (holding that the ALJ should have enlisted a medical advisor to help determine when, if ever, the claimant's liver disease, diabetes, and neuropathy became disabling).

Here, the rationale for requiring the ALJ to consult a medical advisor in *Walton*, *Beasich*, and *Newell* is not present.  Unlike the ALJ in those three cases, the ALJ in the instant case had

-22-

access to and considered an abundance of medical records from the time period prior to the expiration of The Losen's insured status.  Furthermore, The Losen was granted SSI benefits based on the primary diagnosis of anxiety-related disorders, disorders she did not exhibit any symptoms of until late 2001.  (R. at 178.)  Indeed, in the report Dr. DiBella submitted at the same time he first noted these symptoms, he listed a learning disorder, motor vehicle accident, and seasonal allergies as The Losen's diagnoses but made no mention of anxiety.  (R. at 179.)  Thus, unlike the claimants in *Walton*, *Beasich*, and *Newell*, The Losen's established impairment was not slowly progressing in nature.

With regard to The Losen's secondary diagnosis of a learning disorder, the ALJ evaluated and discredited Dr. DiBella's 2001 report, the only medical evidence suggesting an earlier onset date than that of the SSI determination.  (R. at 179.)  Moreover, two state agency medical consultants specifically examined The Losen's medical records from July 1999 to March 31, 2001 and determined that there was insufficient evidence to assess her mental functional capacity during that period.  (R. at 305.)  Thus, summoning another medical advisor to assess the same medical evidence was neither necessary nor required.  Therefore, the rationale for requiring a medical advisor to help the ALJ infer an earlier onset date pursuant to 83-20 is not applicable and The Losen's argument is without merit.

2.      *The ALJ's Failure to Obtain Additional Medical Records*

The Losen further alleges that the ALJ made "little effort" to develop the record.  (Pl.'s Br. 18.)  Specifically, she asserts that the ALJ recognized that he had "very good testimony from the claimant's mother" but failed to satisfy his duty when he did not ascertain additional medical

records.  (R. at 388.)  This Court disagrees, and holds that the ALJ fulfilled his responsibility pursuant to 20 C.F.R. § 404.1512(d).

As illustrated above, the ALJ gathered and considered many of The Losen's school and medical records.  At the ALJ hearing, he inquired into whether there were any additional school records that could be obtained and requested that The Losen's attorney further explore the matter. (R. at 389.)  The ALJ also made "every reasonable effort" to help The Losen get reports from her medical sources by keeping the record open for thirty days in the event that additional medical and/or school records could be obtained.  (R. at 389); 20 C.F.R. § 404.1512(d).  Therefore, The Losen's allegation that the ALJ made "little effort" to develop the record is baseless.

Moreover, it is The Losen who ultimately shoulders the obligation to provide medical and other evidence supporting her claim.  *See* 42 U.S.C. § 423(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require"); 20 C.F.R. § 404.1512(a) ("you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s)"); 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have impairment(s) and how severe it is during the time you say that you are disabled").  Indeed, the Supreme Court has held that "it is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so."  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).  Accordingly, the Court rejects The Losen's argument and finds no deficiency in the ALJ's development the record.

-24-

**C.**     **The ALJ's Requirement of Objective Medical Evidence to Establish an Earlier Onset Date**

The Losen's final argument is that the ALJ erred by requiring her to establish an earlier onset date with objective medical evidence.  (Pl.'s Reply Br. 5.)  In support of her argument, she relies on the Third Circuit's decisions in *Newell* and *Mendes v. Barnhart*, No. 03-3649, 2004 WL 1568097 (3d Cir. July 14, 2004).  However, this Court again affirms the decision of the ALJ and finds The Losen's argument to be without merit.

Under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, a claimant is required to provide objective medical evidence in order to prove his disability.  42 U.S.C. § 1382c(H)(i) ("In making determinations with respect to disability under this subchapter, the provisions of section[] . . . 423(d)(5) of this title shall apply in the same manner as they apply to determinations of disability under subchapter II of this chapter.").  Accordingly, a claimant cannot prove that he is disabled based solely on his subjective complaints of pain and other symptoms.  *See Green v. Schweiker*, 749 F.2d 1066, 1069-79 (3d Cir. 1984) ("[S]ubjective complaints of pain, without more, do not in themselves constitute disability.").  He must provide medical findings that show that he has a medically determinable impairment.  *See id.*

Furthermore, a claimant's symptoms, "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect [one's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. § 404.1529(b); *see Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (rejecting claimant's argument that the ALJ failed to consider his subjective symptoms when the ALJ had made no findings that his subjective complaints were inconsistent with objective

medical evidence and the claimant's hearing testimony); *Williams*, 970 F.2d at 1186 (denying

claimant benefits where claimant failed to proffer medical findings or signs that he was unable to

work).    Similarly, a claimant's allegations are significant in the disability onset date

determination only if they are consistent with the severity of the condition(s) shown by medical

evidence.  SSR 83-20.  However, SSR 83-20 permits "the use of lay testimony and medical

evidence describing history and symptomatology to link an impairment to a date earlier than the

first diagnosis documented by laboratory findings."  *Mendes*, 2004 WL 1568097 at*4 (*citing*

*Newell,* 347 F.3d at 547) ("Retrospective diagnosis of an impairment, even if uncorroborated by

contemporaneous medical records, but corroborated by lay evidence relating back to the claimed

period of disability, can support a finding of past impairment.")).

Here, The Losen's reliance on *Newell* and *Mendes* is misguided.  Unlike in *Newell*, the

ALJ in the present case did not rely on the claimant's lack of prior treatment as a basis for his

holding.  *Newell*, 347 F.3d at 547-48.  Rather, he had an abundance of objective evidence to

consider and did not have the same sort of conflicting testimony and medical findings as in

*Mendes*.  *Mendes*. 2004 WL 1568097, at*4-5 (finding that the claimant's testimony, as well as

the records of numerous doctors suggesting an earlier onset date for an established disability, was

"evidence of the sort contemplated by SSR 83-20.").  As such, the Third Circuit's holdings in

those cases are distinguishable.  Accordingly, the Court finds that the ALJ acted consistent with

relevant statutory and Third Circuit case law in requiring The Losen to provide objective medical

evidence to corroborate the disability onset date she alleged.

## VI.     CONCLUSION

For the foregoing reasons, the Court concludes that substantial evidence supports the

ALJ's decision denying The Losen CDB and DIB.  Therefore, the Court affirms the final

decision of the Commissioner.  An appropriate Order accompanies this Opinion.


Dated: July 16, 2009                                                  /s/      JOEL A. PISANO
                                                                             United States District Court Judge